PLAINTIFF'S EXHIBIT
A

**SCHOOL DISTRICT OF THE CHATHAMS**
**Chatham, New Jersey**

**Policy**

**FILE CODE: 5145.7**
**______ Monitored**
**______ Mandated**
**__X__ Other Reasons**

GENDER IDENTITY AND EXPRESSION

The Board of Education strives to provide a safe, supportive, and inclusive environment for all

The Board of Education strives to provide a safe, supportive, and inclusive environment for all students.

N.J.S.A. 18A:36-41 directs the Commissioner of Education to establish guidelines outlined in this Policy to provide direction for schools in addressing common issues concerning the needs of transgender students, and to assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students.

In furthering this goal, the Board adopts this Policy to address the needs of transgender and gender nonconforming students enrolled in the school district.

For the purposes of this Policy:

1. "Gender expression" refers to the way a student represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, or mannerisms.

2. "Gender identity" means a student's deeply held sense or psychological knowledge of their own gender, regardless of the gender they were assigned at birth.

3. "Assigned sex at birth (ASAB)" refers to the biological sex designation recorded on a person's birth certificate upon the initial issuance of that certificate, should such a record be provided at birth.

4. "Gender identity or expression" also means having or being perceived as having a gender-related identity or expression whether or not stereotypically associated with a person's assigned sex at birth.

5. "Gender nonconforming" describes a student whose gender expression differs from stereotypical expectations, such as "feminine" boys, "masculine" girls, and those who are perceived as androgynous.

6. "Transgender" describes students whose gender identity is different from their gender assigned at birth.

7. "Sexual orientation" describes a person's enduring physical, romantic, and/or emotional attraction to another person. Gender identity and sexual orientation are not the same. A transgender person may be straight, lesbian, gay, bisexual, or asexual.

8. "Transition" is the process by which a transgender person recognizes that their authentic gender identity is not the same as the gender assigned at birth, and develops a more affirming gender expression that feels authentic.

9. "Cisgender" refers to individuals whose gender identity, expression, or behavior conforms with those typically associated with their assigned at birth.

10. "Gender expansive/Gender Diverse/Gender Non-Binary/Agender/Gender Queer" are terms that convey a wider, more flexible range of gender identity and/or expression.

The Commissioner of Education has stated that the responsibility for determining a student's gender-related identity rests with the student. Once a student notifies a school official that s/he would like to be referred to by a different pronoun or name, or requests to use the facilities associated with a different gender, his/her school counselor will meet with the student to confidentially discuss the request. During such meeting, the school counselor will also assess the student's parent/guardian's knowledge, if any, of the student's request. If the student's parent/guardian is not aware of the request, the school counselor will assess whether, and to what extent, parents/guardians can be involved. Thereafter, a meeting will be scheduled with the student, his/her school counselor and the school principal (or designee) to discuss the implementation of the student's requests and preferences. Where permitted by law, and with the consent of the student, parents/guardians shall be included in the discussions, meetings, and decisions regarding a student's request. A student's age shall also be taken into consideration during this process.

The Commissioner of Education directs school districts to accept a student's asserted gender identity regardless of parent consent or involvement. If the student does not want his/her parent involved or informed, the school counselor and principal (or designee) will discuss the risks associated with the student's transgender, transitioning, and/or gender identity status being inadvertently disclosed by, for example, other students relaying such information or from the student's own parent/guardian noticing a name change on school records. School counselors and school administrators will have various resources available to students and their parents/guardians regarding different resources to address the needs of transgender and gender nonconforming students in a public school district.

The Board recognizes school related issues regarding transgender students will vary on a case-by-case basis. Therefore, the Principal or designee, along with the student's assigned school counselor, will meet with the student at a confidential meeting to discuss school-related issues such as the name and pronouns to be used by district staff referring to the student and the gender identification to be used on the student's records and/or class assignments.

The District will take reasonable measures to accommodate the needs of transgender, gender-nonconforming, and gender diverse students. The District shall ensure that a student is addressed by their chosen name and pronoun, regardless of whether a legal name change or change in official school records has occurred. The District shall issue school documentation for a student using their chosen name, gender identity, and pronoun.

Harassment, Intimidation, and Bullying

Due to a specific and compelling need, such as the health and safety of a student or an incident of bias-related crime, the school district may be obligated to disclose a student's status. In this event, the Principal or designee should inform the student the school or school district intends to disclose the student's transgender status for the student's protection and well-being. Prior to disclosure, the student should be given the opportunity to personally disclose that information. The school district should make every effort to ensure any disclosure is made in a way that reduces or eliminates the risk of re-disclosure and protects the transgender student from further harassment. Those measures may include the facilitation of counseling for the student and the student's family to facilitate the family's acceptance and support of the student's transgender status.

Activities

All students must be allowed to participate in a manner consistent with their gender identity. The District shall:

- Provide transitioning, gender-nonconforming, gender expansive, and transgender students with the same opportunities to participate in physical education and school activities as cisgender students

- Permit and support the formation of student clubs or programs affirming and addressing issues related to LGBTQ youth

Athletics/Sports

In accordance with the New Jersey State Interscholastic Athletic Association ("NJSIAA") transgender policy, a transgender student shall be eligible to participate in accordance with either their assigned sex at birth or in accordance with their gender identity, but not both.

Use of Facilities

Transitioning, transgender, gender-nonconforming and/or gender-expansive students will be provided access to facilities, including but not limited to restrooms, locker rooms, and changing facilities in accordance with their gender identity where feasible and appropriate after consideration of the student's age and unique circumstances.

In all cases, the Principal or designee must work with the student and school staff members so all parties are aware of facility policies. The school district must provide reasonable alternative arrangements for any student who expresses a need or desire for increased privacy. Reasonable alternative arrangements may include a single occupancy restroom, use of a private area, or separate changing schedule. The alternative arrangements must be made available to students, who request them, but some students may not want the option of alternative arrangements.

Confidentiality and Student Records

A school district shall keep confidential a current, new, or prospective student's transgender or transitioning status. Schools should address gender non-conforming, transgender, or transitioning students by their chosen name. The student's birth name should be kept confidential by school and district staff. This file containing records of a student's birth name should only be shared with appropriate staff after consultation with the student.

If the student has previously been known at school or in school records by a birth name, the principal should direct school personnel to use the student's chosen name and not the student's birth name. To ensure consistency among teachers, school administrators, substitute teachers and other staff, every effort should be made to immediately update student education records (i.e. attendance records, transcripts, individuals education programs, etc.) with the student's chosen name and gender pronouns, consistent with the student's gender identity and expression, and not circulate records with the student's birth name, unless directed by the student.

The District shall report to the New Jersey Department of Education through NJ SMART a student's name or gender based upon that student's chosen name and corresponding gender identity. Changing the name or gender identity from what was reported in previous years will not affect the reliability of the data reported.

If the District changes a student's name or gender identity, it must also maintain locally a separate record reflecting the student's legal name and sex assigned at birth until receipt of documentation of a legal change of name or gender.

Disclosure of personally identifiable information from a student's education record to other school officials within the district, whom the district has determined have a legitimate educational interest in the information, may be permissible under FERPA.

The Board adopts this Policy to help school and district administrators take steps to create an inclusive environment in which transgender and gender nonconforming students feel safe and supported, and to ensure each school provides equal educational opportunities for all students, in compliance with N.J.A.C. 6A:7-1.1 et seq.

Adopted: January 8, 2024

Key Words

Gender Identity, Transgender, Gender Expression, Gender Non-conforming

**Legal References:**

| | |
|---|---|
| N.J.S.A. 2C:16-1 | Bias intimidation |
| N.J.S.A. 2C:33-4 | Harassment |
| N.J.S.A. 10:5-1 et seq. | Law Against Discrimination |
| N.J.S.A. 18A:6-5 | Inquiry as to religion and religious tests prohibited |
| N.J.S.A. 18A:6-6 | No sex discrimination |
| N.J.S.A. 18A:26-1 | Citizenship of teachers, etc. |
| N.J.S.A. 18A:26-1.1 | Residence requirements prohibited |
| N.J.S.A. 18A:29-2 | Equality of compensation for male and female teachers |
| N.J.S.A. 18A:37-14 through -19 | Harassment, intimidation, and bullying defined; definitions |
| N.J.S.A. 18A:36-20 | Discrimination; prohibition |
| N.J.S.A. 18A:36-41 | Development, distribution of guidelines concerning transgender students |
| N.J.A.C. 6A:7-1.1 et seq. | Managing for Equality and Equity in Education |
| N.J.A.C. 6A:30-1.1 et seq. | Evaluation of the Performance of School Districts |

Executive Order 11246 as amended

29 U.S.C.A. 201 - Equal Pay Act of 1963 as amended

20 U.S.C.A. 1681 - Title IX of the Education Amendments of 1972

42 U.S.C.A. 2000e et seq. - Title VII of the Civil Rights Act of 1964 as amended by the Equal Employment Opportunities Act of 1972

Comprehensive Equity Plan, New Jersey Department of Education

Doe v. Regional School Unit 26, No. 12-582 (Me. Jan. 30, 2014)

New Jersey Department of Education, Transgender Student Guidance for School Districts, September 2018.
https://nj.gov/education/students/safety/sandp/transgender/Guidance.pdf.
NJSIAA, Constitution, Bylaws, Rules and Regulations, Transgender Policy (pg. 75), http://www.njsiaa.org/resources/njsiaa-handbook

**Possible Cross References:**

| | |
|---|---|
| *2224 | Nondiscrimination/affirmative action |
| *4111 | Recruitment, selection and hiring |
| *4111.1 | Nondiscrimination/affirmative action |
| *4131/4131.1 | Staff development; inservice education/visitations/conferences |
| *4211.1 | Nondiscrimination/affirmative action |
| *4231/4231.1 | Staff development; inservice education/visitations/conferences |
| *5131 | Conduct/discipline |
| *5131.1 | Harassment, intimidation and bullying |
| *5145.4 | Equal educational opportunity |
| *6121 | Nondiscrimination/affirmative action |
| *6145 | Extracurricular activities |

*Indicates policy is included in the Critical Policy Reference Manual.

The following organizations provide support to transgender individuals:

• GLSEN model policy.  GLSEN is a prominent organization supporting GLBT youth. They have resources about creating safe and supportive environments for students.

• The Trevor Project is the leading national organization focused on crisis and suicide prevention efforts among lesbian, gay, bisexual, transgender and questioning youth.

**Resources For Parents, Educators, And Service Providers:**

Founded in 1972 with the simple act of a mother publicly supporting her gay son, PFLAG is the nation's largest family and ally organization.

**PFLAG Resources**

• Welcoming our Trans Families and Friends
Download this free guide (PDF) to get the basics on what being transgender means, how to talk about it, and how to find the resources that can support you.

• Find a PFLAG Chapter.
There are more than 350 chapters of Parents, Families and Friends of Lesbians and Gays (PFLAG) across the U.S. Find one near you right now.

**Partner Organizations Resources**

• National Center for Transgender Equality
Knowing and using correct language can be very important to transgender and gender non-conforming people, just like everyone else. Here is a handy terminology guide regarding gender identity.

• American Psychological Association
This downloadable pamphlet from the APA answers questions about transgender people, gender identity and gender expression.

**Parent and Educator Resources**

• Gender Spectrum

Raising children who don't fit neatly into male or female boxes brings a wealth of questions and uncertainties. Here you will find information and support to assist you in your search for answers.

• Trans Youth Equality Foundation
The Trans Youth Equality Foundation is based in Maine, but offers education, advocacy and support for transgender and gender non-conforming children and youth and their families everywhere by sharing information about the unique needs of this community and partnering with families, educators and service providers to help foster a healthy, caring, and safe environment for all transgender children.

• Families in TRANSition: A Resource Guide for Parents of Trans Youth
Families in TRANSition: A Resource Guide for Parents of Trans Youth is the first comprehensive Canadian publication (created by Central Toronto Youth Services) to address the needs of parents and families supporting their trans children. It summarizes the experiences, strategies, and successes of a working group of community consultants – researchers, counselors, parents, advocates as well as trans youth themselves.

• Matt Kailey, author of My Child is Transgender: 10 Tips for Parents of Adult Trans Children
This gentle and easy-to-use FAQ gives people an accessible set of guidelines that can be used in everyday life.

• Working with Transgender Youth (Lambda Legal & Child Welfare League of America)
Like all young people in care, transgender youth are entitled to bias-free attention to their unique needs and to be safe in their placements and services. This guide, created by Lambda Legal and the Child Welfare League of America, provides child welfare professionals who work with transgender young people with education about transgender issues and tools to help prepare them to work sensitively with these clients.

• Trans Youth Family Allies (TYFA)
TYFA works to empower children and families by partnering with educators, service providers and communities, to develop supportive environments in which gender may be expressed and respected. They envision a society free of suicide and violence in which all children are respected and celebrated.

PLAINTIFF'S EXHIBIT B

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CIVIL PART
MORRIS COUNTY
DOCKET NO. MRS-C-042-23
APP. DIV. NO. _____________

| | |
|---|---|
| MATTHEW J. PLATKIN, ATTORNEY GENERAL OF N.J., Et Al., Plaintiffs, vs. HANOVER TWP. BOE And HANOVER TWP. PUBLIC SCHOOLS, Defendants. | TRANSCRIPT OF ORDER TO SHOW CAUSE |

Place: Morris County Courthouse
Washington & Court Streets
Morristown, N.J. 07963

Date: September 6, 2023

BEFORE:

HONORABLE STUART A. MINKOWITZ, J.S.C.

TRANSCRIPT ORDERED BY:

MATTHEW J. GIACOBBE, ESQ., (Cleary Giacobbe Alfieri Jacobs, LLC)

APPEARANCES:

JAMES MICHAEL, ESQ., (Interim Chief, Deputy Attorney General)
Attorney for the Plaintiffs

APPEARANCES CONTINUED

Agency: Accurate Transcriptions, LLC
P.O. Box 120
Bayville, New Jersey 08721
Tel. 973.271.1410
Fax. 1.877.292.2521
Audio Recorded
Recording Operator: D. Rivera

APPEARANCES CONTINUED

MATTHEW J. GIACOBBE, ESQ., (Cleary Giacobbe Alfieri Jacobs, LLC)
Attorney for the Defendants

## I N D E X


| PROCEEDING | PAGE |
|---|---|
| Order to Show Cause | 4 |


## I N D E X TO E X H I B I T S


| NUMBER | DESCRIPTION | ID | EVD |
|---|---|---|---|

No exhibits marked

ARGUMENT

BY: Mr. Michael 6, 39
BY: Mr. Giacobbe 15

THE COURT

Decision reserved

(Proceeding commenced at 10:13:05 a.m.)

THE COURT: Thank you. You can be seated. Okay, are we on the record?

COURT CLERK: We are on the record.

THE COURT: All right, thank you.

All right, this is Platkin, et al., versus Hanover Township Board of Education, et al, Docket MRS-C-42-23.

Can I have appearances of counsel, please?

MR. MICHAEL: James Michael, Deputy Attorney General, for the plaintiffs.

MR. GIACOBBE: Matthew Giacobbe, Cleary Giacobbe, on behalf of defendants.

THE COURT: Okay, thank you, counsel. And good morning.

For the purposes of the record, I did have the opportunity to meet with counsel in chambers just before coming out on the bench here today. I am basically going to summarize what we discussed. We basically discussed the use of electronic devices in the courtroom, when they would be permitted and under what circumstances.

There have been some requests from members of the press to be here today and have registered with the Trial Court Administrator's office. Still photography

is permitted from the rear of the room only, with no noise and no flash photography.

There are no recordings that are permitted in this room, other than the official recording by any means, unless there has been express permission from the Trial Court Administrator's office. Anybody who uses or records any proceeding in this room without express permission from the Court is subject to penalties up to six months incarceration and up to a $1,500 fine.

The courthouse is not to be used for any interviews or otherwise; in other words, if any member of the press or anyone wishes to question any party or any participant in this building relative to these proceedings or any other for that matter, that is prohibited within the courthouse. You may go outside and ask questions, if anybody who wishes to respond to those questions, but you may not do it inside the courthouse.

I think that summarizes what we addressed. Did I miss anything, counsel?

MR. GIACOBBE: No, sir.

MR. MICHAEL: No, Your Honor.

THE COURT: Okay. Thank you.

All right, we are here on the application by the plaintiffs seeking preliminary restraints pending

administrative review on a complaint filed with the Division on Civil Rights and this preliminary restraint application would restrain any enforcement of a recently revised Policy 8463 from the Hanover Township Board of Education pending the final review and resolution of that administrative matter. I have reviewed the papers. I am prepared to hear argument on the application for preliminary restraints.

With that, Mr. Michael, I will hear from you.

MR. MICHAEL: Thank you, Your Honor.

As Your Honor is aware, it's been a full and eventful summer in this case. So, it may be helpful to sort of refocus on the reason why we are here.

The singular purpose of this application is to maintain the status quo while an administrative complaint challenging the legality of the original and the revised parental notification policies are being adjudicated for the Division on Civil Rights.

So, the plaintiffs are not here asking the Court to make a determination on the lawfulness of the policies, that's going to happen in the underlying matter, but only to keep the status quo in place while the underlying case is ongoing, to prevent the harm that could result from implementation of these policies. And as we've laid out in our papers, that harm could result

from the outing of gay and transgendered students without their consent.

So, the status quo relief that is requested here is expressly authorized by the Law Against Discrimination and its relief that the Appellate Division has instructed trial courts that they should not take a grudging or narrow approach to. So, that is why we are here.

Since we are asking for the status quo, it is probably also helpful to talk about, you know, what is the status quo. And the status quo here is what existed prior to the adoption of Policy 8463 in May of this year.

So, prior to the enactment of that policy in May, there was not a district policy that directed staff to make parental reports based on information concerning a student's sexual orientation or gender identity. And the district had a transgender policy that was in full force and effect that addressed disclosures to parents regarding transgendered students and how such disclosure should be handled.

In fact, that policy has been in place for four years in the district and there is no indication that any child in Hanover has been harmed by the district following that policy, nor is there any

indication in any other district that has followed a similar policy that any harm has resulted to any student as a result of following that policy, or the DOE guidance that the policy is based on.

THE COURT: Mr. Michael, is that Policy 5756?

MR. MICHAEL: It is, Your Honor.

THE COURT: Okay, thank you.

MR. MICHAEL: All right. So, that is the status quo.

It may also help to talk about what the status quo does not mean. It does not mean that the school would be prohibited from notifying parents of legitimate health and safety concerns regarding their students. There are roughly two dozen policies in the district that predate 8463 that address parental notification for various topics and subjects and those all can still be followed for parental notifications to be made.

And even in the case of transgender students, the transgender policy and DOE guidance permits parental notification, even when the student would object in response, when it is incidental to a legitimate health or safety concern or when the student is a victim of a hate crime or bullying. The only thing the status quo would prevent is the school from disclosing the LGBTQ Plus status of a student without consent in the absence

of a legitimate health or safety concern. So, that's the status quo.

I also want to be clear about one other thing. The plaintiffs in this case, the Attorney General and Director of the Division on Civil Rights, recognize and support parental involvement.

What this case is about is that small sub-set of students who may be out or questioning their LGBTQ Plus status at school but not at home and do not want the school to report that status back to their parents, particularly if it's not related to a particular health or safety concern. It is the harm to those students that this application seeks to prevent.

Dealing with the merits of the application, I am not going to repeat the arguments that I made back in May in our brief as to the original policy, but I do want to talk just a little bit about the revised policy.

While a content of revised policy may be slightly different in form from the original policy, the revised policy really bears little distinction from the original in function and the revised policy must be understood in the context of the history here.

In this case we had some, there was some discussion from the Board, they adopted the policy, the next day we filed our case. The Board put out a

statement reinforcing their belief in the policy but then a couple weeks later then issued the -- unilaterally went and issued the revised policy.

So, what the revised policy is, is really just a repackaged version of the original policy, taking out certain words but otherwise reaching the same result as the original policy.

Mr. Michael, let me ask you this.

MR. Michael: Mm-hmm.

THE COURT: The new policy obviously makes specific reference now as to the Law Against Discrimination, which did not previously; does that change the overall tenor of the revised policy?

In other words, previously it specifically identified protected classes. Now it doesn't specifically identify protected classes and it makes reference to the New Jersey Law Against Discrimination.

In other words, it specifically states notification cannot be based on a student's actual or perceived protected characteristics under the New Jersey Law Against Discrimination. And it cites the statute.

MR. MICHAEL: So, in this case, while the Board sort of took out, I guess what might be considered the problematic terms, which it doesn't specifically reference sexual orientation or gender identity or

transitioning anymore, but it really is, it gets into the same effect and it is not in compliance with the LAD. But what they, what the school district did, while taking out those terms and sort of adding what appears to be a proviso that it is not to be based on a protected characteristic, they layered in multiple other provisions that brought this policy to really get to the same place as the original policy.

For example, Your Honor, there is, and I think there is probably five different provisions that were put in that, you know, that sort of get to that point.

The first one, while the Board put in a provision that said that a notification cannot be based solely on a protected characteristic, they insisted -- the Board had a lot of options in revising the policy when they did this, but they chose specific language.

In this case they said a notification cannot be based solely on a protected category. So what that does is still permits a notification if it's based partially or even primarily on a protected characteristic. And in this case it would still violate the Law Against Discrimination.

There is no requirement in the LAD that an action be based solely on a protected class to violate the law. All that has to happen is that it needs to

make a difference. So, that is one.

The other thing, the trigger here is slightly different but rather similar, as to what would trigger a notification, and it actually is a -- if you sort of look side-by-side by the policies, there is actually a slight modification in that the original policy said it had to be a material event or a material circumstance. The material term has been taken out in the revised policy and it just sort of leads this rather sort of amorphous term of when a student discloses or exhibits behavior that may have an adverse impact on the student's health or wellbeing, which at this point is now undefined.

But in directing staff to make notifications, you can't, you have to sort of look at this in the context of the history here, and in the history of just, you know, in the weeks and months before adopting this policy, the Board very openly said that sexual orientation and gender identity and transitioning are, in fact, items that adversely affect the student's health or wellbeing. They have done nothing to sort of disavow that belief in setting forth this policy and leaving that same trigger in.

The other sort of thing that sort of also highlights what's going on in this policy, in the

revised, it wasn't in the original, is it expressly supersedes the transgender policy.

THE COURT: You mean policy --

MR. MICHAEL: 5756.

THE COURT: Okay.

MR. MICHAEL: It also adds in to the revised policy that was not in the original policy a duty of candor. Now, this is -- sort of this duty of candor also is sort of undefined in the policy. And it is also a term that is not used by the district in any other policy. They have more than a hundred policies and I have sort of searched them all and no other policy that the district has a duty of candor.

So, in the context of this case and in the history here, that duty of candor can only be read to sort of, to insist on there is an affirmative duty on staff to make a report to parents of LGBT status when they are aware of it.

THE COURT: Are you arguing, Mr. Michael, that this is an implication that any staff member who does not report would be subject to discipline as a result of failing to report as required?

MR. MICHAEL: Yes. I think that that's the case. And that sort of is reinforced in the other requirements of the policy, because what the revised

policy does is, I am saying authorizes, but in fact, it sort of directs all staff, and that's regardless of certification, regardless of position, expertise or experience, all staff are directed to make parental reports based on their own determination of whether a student's health or wellbeing has been affected.

The only thing that is added in is, there is a requirement of notice to the administrator, but it's only notice. It's not sort of an approval process. The way that policy is written, once that notice is made, the staff member, and again, this is any staff member, regardless of position or expertise, is then required to under this policy make the parental notification. That's even if the administrator would say, no, don't make that notification, the way this policy is written, they are still directed to make the notification.

So, in all of these multiple added provisions in the revised policy are considered in the history of this case, it really does lead to the same result and is just a repackaged version just trying to clean up some of the language but getting to the same place.

So, for that reason, that's why we have asked both that the original policy and the revised policy be enjoined while the underlying case is going on at the Division of Civil Rights.

In terms of the other factors, I am not going to repeat what we have talked about in brief before, about the potential harm to students. It's clear that these are a vulnerable population, and in particular, when they have been outed against their will and we have cited to in our briefs and we have previously discussed the harm that could result to these students.

And I would just note on that issue, the recent determination made by Judge Bauman in Monmouth County, when he found that the statistical possibility that even one transgender student affected by the amended policies should run away from home or attempt or commit suicide is sufficient to tip the balance of the equities in favor of the State. So, a similar result is called for here.

And particularly with you, I don't want to necessarily get into a comparison of all the policies, but what the Monmouth County cases involved was just some modifications of the transgender policy. What we have here in this revised policy is completely -- is superseding it. So, in that case this goes even beyond what the schools in Monmouth County were doing.

So, for these reasons, and the reasons cited in our brief, the State's application to maintain the status quo while the administrative complaints are

resolved should be granted. And I can answer any other questions the Court may have.

THE COURT: Thank you, Mr. Michael.

Mr. Giacobbe, I will hear your response.

MR. GIACOBBE: Good morning, Your Honor. Interestingly that Mr. Michael talks this is just a repackaged version, it is not a repackaged version whatsoever.

If you read the policy, the cause is not the triggering event. Under the revised policy and the regulation which clarifies the policy, it's the adverse impact. If a child says something or displays behaviors that indicate an adverse impact on their mental, physical or emotional wellbeing, you notify the parent. It's the harm, the potential harm that is the triggering factor. The cause is frankly irrelevant. It could be that your dog died last night. It could be that your parents are going through a nasty divorce. There is a whole host of harms.

What this policy does is when a teacher sees that a child is suffering and is undergoing some type of harm, you notify the parent.

THE COURT: What is --

MR. GIACOBBE: And frankly --

THE COURT: What is --

MR. GIACOBBE: -- when Mr. Michael --

THE COURT: Let me just ask you this, Mr. Giacobbe.

MR. GIACOBBE: Yeah.

THE COURT: Define for me -- define for me, if you would, what the term adverse impact means.

MR. GIACOBBE: It's an adverse impact, Your Honor, on the mental or physical health.

THE COURT: What is adverse impact?

MR. GIACOBBE: Adverse means --

THE COURT: Who tells me what's adverse?

MR. GIACOBBE: It's --

THE COURT: And who tells me what causes impact and what doesn't?

MR. GIACOBBE: Well, Your Honor, we have certified teachers, we have staff --

THE COURT: This applies to the janitor and --

MR. GIACOBBE: No.

THE COURT: -- and to the bus.

MR. GIACOBBE: If you read, if you read the regulation, Your Honor, which Mr. Michael ignores, you do notify the principal --

THE COURT: It's notification, it's not --

MR. GIACOBBE: Well, then the principal in the regulation specifically determines, if it's a

non-certified person, the principal is the one who notifies the parent. For certificated people, the principal then adjudges whether or not you need to bring in another certified person, i.e. a school psychologist, to determine if the kid is suffering.

THE COURT: So, in other words, it's going to be the school principal or the school psychologist who defines what adverse impact is?

MR. GIACOBBE: Absolutely. And it is no different, Your Honor, than the very -- than the guidelines that the State put out under transgender 5756. Because in that it says you can notify parents if there is a health or a safety concern.

Well, Your Honor, I don't have to say that indicia of an adverse impact on somebody's mental, physical, or social emotional well-being is a lot more clear than health and safety.

So, Mr. Michael gets up here and says that the revised Policy 8463 supersedes 5756, it doesn't. They both require notification for health and safety.

THE COURT: This goes beyond health and safety though, counsel. This goes into social and emotional well-being. That's different than just simply -- because you have safety and you have mental health, but then you add social emotional wellbeing.

MR. GIACOBBE: Well, Your Honor, in fact, the training that is going on in all schools throughout the State right now is dealing with mental, social, emotional wellbeing. And they are looking at children in the impact like social media (indiscernible) and the impact on their mental health.

Social and emo -- your emotional wellbeing is tied to your mental health. Your social wellbeing is tied to your mental health. They are not separate and distinct things.

THE COURT: Well, you made it separate and distinct in your policy.

MR. GIACOBBE: No, it says "and/or."

THE COURT: Correct.

MR. GIACOBBE: Right.

THE COURT: But why include it if it's part of mental health?

MR. GIACOBBE: Because, Your Honor, the social and emotional -- your emotional wellbeing, you are happy, you are sad, you are despondent, that's your emotional wellbeing. And so, the purpose of this is that if a teacher or a principal or the school psychologist adjudges that this child is suffering, you notify the parent.

THE COURT: But counsel, that's not what it

says. It says adverse impact, not suffering.

MR. GIACOBBE: Adverse impact, Your Honor, is just another way, some type of deleterious impact on a child.

THE COURT: But there is a big difference because this imposes a mandate on the school staff to make the notification. This is different than simply assessing whether something has affected a child, adversely perhaps, but adversely to the point where the parents need to be notified.

I think we went through this at the last hearing. I pointed out a variety of examples to you: if a kindergartner doesn't like their lunch that day, they may have a breakdown at 1:00 in the afternoon because children of that age tend to get cranky and tired and may have a breakdown because their lunch is not what they wanted for that day. That may be an adverse impact as defined by the teacher but they don't have discretion not to notify.

Now, if we carry this to any further logical conclusion, again, I brought to you the last time, and there is certain language in here that's qualifying what the requirements are, and that's where the term cannot be based solely on a student's actual and a perceived protected characteristics. This is really the threshold

that Mr. Michael is referring to which opens the door to, in effect, what was previously in the policy before the revision. That's my concern, because you have not limited that concept. There is no definition.

MR. GIACOBBE: Your Honor, there is -- if you look at the regulation, Your Honor, it is defined what -- it covers the LAD. And Your Honor, what it --

THE COURT: But it says not solely. So, in other words, it can consider, doesn't even say primarily.

MR. GIACOBBE: Your Honor, in Mr. Michael's own brief he admits that you can disclose characteristics if it's tied into the impact. What this is, the trigger is not the -- for example, he would like me to believe that if I see a child who I believe is transgender, I notify the parent. That's not what this policy says.

THE COURT: But that's -- you are presuming that, because you have to read into the mind of the staff member who is perceiving it or as you say observing it, and again, something that's undefined, you indicate not only observation, but an indicia of adverse impact; isn't that subjective to the individual who is observing it?

MR. GIACOBBE: Your Honor, in all candor, if

you look at Policy 5756, Mr. Michael and the State is arguing is clear and allows parental notification, it says you notify the parents when there is a health and safety concern. That is not defined. It doesn't say what kind of health. Is it a physical health issue, is it a mental health issue, is it an emotional health issue? What type of safety concern?

This policy, frankly, is much more clear, because it talks about your mental, your physical and your emotional wellbeing. And there has to be some type of adverse harm. And Your Honor, we entrust teachers, principals, paraprofessionals to care for our children in loco parentis while they are there. And in loco parentises they make judgment calls all the time. And in this case, they are not just making a judgment call and calling the parent. They are making a judgment call. They are saying, I think this kid is being -- there is something wrong with this kid. The kid is not acting -- is acting different, they are despondent, I am worried about the kid. They go to the principal, I am worried about this kid. And the principal could say, oh you know what? I already talked to the parents about it. There is layers here.

THE COURT: But the principal can say, you know what, I don't think we should notify the parents.

I don't think it's necessary. But the policy doesn't permit that.

MR. GIACOBBE: And Your Honor, the principal also has the -- that's actually not accurate, because the principal can then bring in another certificate staff member, and then it's the principal's call solely to bring in a school psychologist to make that assessment.

THE COURT: But the policy doesn't permit that discretion to the principal. The policy says that it must be reported after notification to the administrator and to the --

MR. GIACOBBE: Your Honor, frankly, reporting that a kid is upset, reporting that a kid is somehow suffering, how is that volitive of the Law Against Discrimination? It's not. There is nothing in the Law Against Discrimination that says it's illegal to tell parents that their kid is suffering. It doesn't exist. There is no caselaw that says that.

THE COURT: But counsel, the problem is you have a qualifying statement within this policy that opens the door to discrimination under the LAD and that's where it says they cannot be based solely on a student's actual or perceived protected characteristics, which means they can. It doesn't limit it.

In other words, you have opened the door to a consideration of characteristics that are protected under the LAD in the consideration of whether something has caused an adverse impact to a child, which is absolutely subjective based on the observer. But you also eliminated discretion from the teacher or the staff member from determining what level, if any, it has an adverse impact, because you've eliminated that entirely.

In other words, the teacher is required under penalty of discipline to notify the parent, either through the administration or otherwise.

MR. GIACOBBE: And Your Honor, the -- when you read the LAD --

THE COURT: Meaning you are causing the teacher to potentially violate the child's civil rights. Because you are treating them differently based upon their protected status.

MR. GIACOBBE: Your Honor, we're not. The notification has nothing to do with a protected status or the cause. If a teacher --

THE COURT: But counsel, you put in qualifying language in here that opened the door to, not only permit it, but require it, because you made it nondiscretionary.

MR. GIACOBBE: Your Honor, the notification,

if a kid is suffering --

THE COURT: We are not talking about suffering. You said in the policy such notification cannot be based solely, meaning it can be based on a student's actual or perceived protected characteristics under the LAD. Can't be solely that, you don't even say primarily.

So, in other words, it could be a small part perhaps and that teacher has no discretion. Again, it leads someone to believe that the school is now taking action that identifies protected classes and treats them differently than it would anyone else.

MR. GIACOBBE: Your Honor, the LAD, it says you cannot be based solely on it. And solely means you can't say I think that child is gay, I am going to call the parent. That is a violation of the LAD.

What this policy requires, Your Honor, is you look at the impact, not the cause, but the effect, and if the effect is that a kid is suffering an adverse impact mentally or physically you notify the parent, and Your Honor, frankly, right now --

THE COURT: But that impact is subjective. It's absolutely subjective of the observer.

MR. GIACOBBE: Your Honor, under the 5756 policy that the AG keeps on promulgating is the greatest

thing that's ever been written, which by the way, is not a mandatory policy, it is not mandatory. So he wants you to enjoin us with regard to that policy, it's not even a mandatory policy, but the 5756 says you notify parents when there is a health or safety concern, and that policy is specifically derived to a protective characteristic, transgender. It's not even LGBTQ, it's transgender. This is the State that promulgated a policy that is specifically focused on one class of protected characteristics and says you can notify the parent under this one class of protected characteristics, transgender, for health and safety. How is that -- that policy is totally illegal. If you find that --

THE COURT: But counsel, that policy is not before me.

MR. GIACOBBE: Your Honor, it is before you, because Mr. Michael has asked you to maintain the status quo and enjoin it and have that policy there. That is before Your Honor.

THE COURT: To maintain the status quo basically to what had occurred prior to the initiation of this policy.

MR. GIACOBBE: In 5756, Your Honor, is a non-mandatory policy. So, the status quo is you could

repeal it.

THE COURT: Counsel, again, it's not before me. Other than to maintain the status quo as it was prior to the revised policy. If that's going to be the position that it was voluntary, then that's your position, that's not before me either.

MR. GIACOBBE: Your Honor?

THE COURT: The only issue is to whether this particular policy should be enjoined preliminarily pending review, again, considering the Crowe factors, even though we are asking for status quo in the waste management, which is minimizes the Crowe factors to some extent. In other words, we don't have to go into great detail with regard to hardship or likelihood of success on the merits or otherwise.

The question is before me, is there a potential for irreparable harm and the potential for deprivation of civil rights, enough so that I should maintain the status quo pending a formal review.

MR. GIACOBBE: And Your Honor, what everyone keeps on ignoring is there is irreparable harm, potential for irreparable harm, and potential for a violation of civil rights; namely, the Constitution of the United States, the 14th Amendment. Parents have a constitutional right to be involved in their children's

lives. And Mr. Michael and the AG are trying to do here is trample on that.

And they say they are not against parental notification, but Your Honor, the application before you is enjoin the whole parental notification --

THE COURT: Counsel?

MR. GIACOBBE: -- don't do it. So, that's sends a message to teachers, it does, Your Honor, that --

THE COURT: Counsel, this argument is very difficult for me to comprehend, and I will tell you why, because this policy invites governmental interference in the relationship with a parent and a child. That's what it does. It leaves a government official with no discretion as to whether or not to ensure accuracy in reporting, which means there has to be some type of investigation to do, report something in a subjective understanding of what's going on in the relationship or dynamic between a parent and a child, and potentially harboring a child as a result of that investigation and reporting. It invites interference in the parental and child relationship.

MR. GIACOBBE: Your Honor, I respectfully disagree.

THE COURT: I understand you do.

MR. GIACOBBE: What it invites is it invites teachers and teaching staff who are stating in parentis loco, they are taking care of the kid, to share that information with the parent. Your kid is suffering, we want to let you know. You don't even have to tell what the cause is. It doesn't say you have to tell the cause. Nowhere in the policy does it say that. It says if your kid is suffering, let them know.

THE COURT: But again, counsel, this policy engages in a process based upon a singling out of an individual, based upon their protected characteristics. That's what it does. It opens the door. That particular sentence in the policy opens the door to that consideration.

MR. GIACOBBE: So, Your Honor, so your position is if that one sentence, "solely based on protected characteristics," was struck, the policy would be fine then?

THE COURT: I am not going to say that either.

MR. GIACOBBE: Well, because the purpose of that, Your Honor, is that when we talked before Your Honor and we argued it, we wanted to make it clear, the Board wanted to make it abundantly clear that, and I think Your Honor gave an example if a child walks in with a rainbow sweatshirt, are you going to notify the

parent? And what this policy says is no. If a child walks in with a rainbow sweatshirt, you don't notify them. You have to show an adverse impact.

THE COURT: But adverse impact is in the eye of the beholder, counsel. That's the problem.

MR. GIACOBBE: What's that, Your Honor?

THE COURT: Adverse impact is in the eye of the beholder.

MR. GIACOBBE: Your Honor, it's in the eye of the beholder today as we speak.

THE COURT: I'm going to give you -- if someone who has devout religious beliefs were to see a child with a, I think it was a unicorn upon a T-shirt, their perception of that display of a T-shirt may be very different than someone who perhaps does not have devout religious beliefs. The person with religious, devout religious beliefs may say that's an adverse impact on that child, based upon what that child is displaying on their shirt, in their subjective view and their sensibilities. There is no right, there is no wrong, that's their subjective view in their eyes that this is an adverse impact that requires notification into this policy.

MR. GIACOBBE: Your Honor?

THE COURT: You are going to say that's not

true, but that's not defined here.

MR. GIACOBBE: Your Honor?

THE COURT: Not only that, you are making it mandatory for that teacher to report. Not only that, because of the discipline that is projected as a result of violating this mandatory notification requirement, you are now requiring that particular staff member to channel the sensibilities of their administration to determine whether or not notification is necessary, whether there is an adverse impact.

In other words, you are leaving them no choice. They can't make that individual determination. They can't make that individual discretion. They have to report it to the administration and this whole procedure begins based upon their, either their perception, based on their sensibilities or the administration's perception based on their sensibilities.

MR. GIACOBBE: Your Honor, they make the initial determination if they believe it is an adverse impact. If they don't believe it's an adverse impact, there is no notification. They have to believe it's an adverse impact.

THE COURT: But I am telling you adverse impact is in the eye of the beholder. It's entirely

subjective.

MR. GIACOBBE: We have that law right now. All staff members in schools, teachers, principals, et cetera, if they reasonably believe, they believe that a child is being abused or neglected, they have no discretion. They must report it to DCP&P and the prosecutor. They are making a subjective thing, you know what? That kid doesn't look clean, I think they might be being neglected. They have to report it. This occurs all the time. Under the 5756 policy, they are making an assessment. I think this could impact the child's health and safety, so under the transgender policy, I have to report it. It happens all the time.

And if you look at the list in the regulation, Your Honor, there is a multitude of policies that require parental notification, a multitude. And that multitude, every one of those, requires a teacher or a principal or a staff member to make assessments of a kid. They're portrayed professionals. They are licensed. They are licensed to assess children in how they are doing scholastically and how they are doing emotionally. They spend time with them. Often they spend more time with them than their own parents do. So, they are seeing things and are able to say things. They make assessments all day long and that is not

unlawful under the New Jersey Law Against Discrimination. They are not notifying people. You cannot notify anybody based on a protected class. That's clear. If it's just a protected class, it is unlawful to make a notification.

If the kid is -- if a child, if a teacher believes that a child is suffering emotionally or mentally, and it might be based on a protected class or it might not, then you notify the parent. And frankly, it's a facially neutral policy. It applies to every kid who is suffering.

THE COURT: Counsel, but that's not what your policy said. If it said it can't be based, it's plain and simple, it can't be based on a protective characteristic of the New Jersey Law Against Discrimination, it might be a different argument. That's not what it says. It qualifies that.

MR. GIACOBBE: Your Honor, because if you look at the caselaw, and in fact, if you look at Mr. Michael's brief, if you read in his brief, he specifically says that the notification itself can be a disclosure of a protected class.

In fact, under the transgender policy, the guidance that the Commissioner of Education put out, if you disclose to a parent a health and safety concern

about a transgender kid, you are telling the parent their status, right there that implicates the LAD. Under the transgender guidance and policy that Mr. Michael says that this violates, that very policy does the exact same thing, they make the assessment and you tell the parent.

THE COURT: Counsel, just so it's clear, I am not saying that Mr. Michael is correct or that you are correct or that either of you are wrong. I am simply saying what's before me right now is this policy and no other.

So, you might be correct, you might not be correct as it relates to other policies, what they say and whether or not they would comply if they were challenged under the Law Against Discrimination.

The question is this particular one and the potential for harm and in my eyes I see the potential for harm for two groups, potentially students, as well as the teachers who would be subject to discipline because of the inability to understand necessarily what they were supposed to abide by.

MR. GIACOBBE: Your Honor, this policy --

THE COURT: There is also a third party here and that's the parents, as well, because now you have the potential for interference in the parent/child

relationship.

MR. GIACOBBE: Interfere -- I mean, frankly, Your Honor, if the parent/child relationship, if teachers aren't free to tell parents what is going on in their child's lives, that's the interference.

Here what it is saying is, if you, teacher, you make the initial assessment, if you believe the kid is suffering, you notify the parent.

THE COURT: But that's not what this policy says.

MR. GIACOBBE: If the teacher says, hey, the kid is not suffering at all, the kid wants to be called by a different name, there is no adverse impact. A kid is wearing, you know, a rainbow shirt, no adverse impact, the teacher makes that call. No one is saying the teacher doesn't make the initial call. They make the call.

THE COURT: The teacher has no discretion. The teacher must make the call.

MR. GIACOBBE: They absolutely have discretion, Your Honor. They make --

THE COURT: They must -- under this policy it takes the discretion away from the teacher.

MR. GIACOBBE: Your Honor, the initial discretion is, is there an adverse impact or not?

That's the discretion of the teacher. They're the ones who make the (indiscernible). If they don't believe there is an adverse impact, there is no notification.

THE COURT: I understand. I understand the argument, Mr. Giacobbe.

MR. GIACOBBE: And Your Honor, I think that what Mr. Michael is attempting to do here is, A, he keeps on referencing the old policy which is moot; B, he wants you to enjoin this policy blanketly across all parental notifications, which is just patently wrong, given the fact that parents need to know what's going on in their kids lives. When you look at the parental notification policies --

THE COURT: Just for the correction of the record, I don't think actually that is the relief that was sought. There was a qualification to the relief sought for the purpose of this injunction, if I am not mistaken.

MR. GIACOBBE: The way I read it, Your Honor, it's a blanket -- it's not a narrow.

THE COURT: Except to the extent that it violates the LAD, if I am not mistaken.

MR. GIACOBBE: Your Honor?

THE COURT: I just want to make sure the record reflect it accurately.

MR. GIACOBBE: But then the same laws should be applied here, there is a lot of other policies then, and frankly, including the transgender policy, that violates the LAD based on that law.

THE COURT: Again, that policy is not before me, counsel.

MR. GIACOBBE: Well, but Mr. Michael has asked for you to restrain us.

THE COURT: I understand.

MR. GIACOBBE: But he has asked you to restrain us from being able to revoke that policy. That's in his order.

THE COURT: Fair enough.

MR. GIACOBBE: So, he has put this before you, Your Honor.

And frankly, Your Honor, at the end of the day, we have the status quo, frankly, is that if you look at 8463, it's regulation 5756, all the parental notification policies, every one of them has a teacher, a staff member, making judgment calls. They make judgment calls all day long. They grade kids. They do everything. They act in the role of the parent. That's their charge. They make judgment calls about reporting kids to DCP&P. All of these are subjective judgments that they make.

So, it's not a mandatory notification. It's only mandatory if the teacher believes that the kid is adversely impacted, emotionally, mentally or physically. And if you don't have a teacher finding an adverse impact emotionally, mentally or physically, they don't notify.

So, the initial assessment stays with the teacher, Your Honor. And it's when the teacher believes that the kid is being harmed you then notify.

So, we would ask that Your Honor deny their application. I think it will send a very, very bad message what they are seeking. And frankly, I think it's kind of interesting, Mr. Michael and the AG gets up and says, we're not against parental notification, we're all for it. We want the whole world to think they we are for it. They are not. Because if they were, they would have promulgated a parental notification policy that they think is appropriate. They haven't, Your Honor. We worked with Your Honor and Mr. Michael all summer and many of the things found in that regulation are the very things that we talked about, listing all of the other policies that have parental notification. We did that. Defining the New Jersey LAD discrimination. We did that. Putting in a whole procedure by which it's not just a mandatory that teacher runs and calls a

parent. You go to the principal. The principal then notifies a school psychologist. If it's not certificated, it's the principal that makes the notification. All that's contained in the regulation amplifying the policy which was adopted. And that was all due to the ongoing efforts of the Board in good faith to come up with a parental notification policy.

But as we sit here now, we actually argued, it was the day after Memorial Day, and it's now September 6th, and I haven't seen any parental notification policy promulgated by the AG or the Department of Education saying if you want a parental notification policy, this is what you should do. That hasn't happened.

THE COURT: Okay, counsel that is not before me.

MR. GIACOBBE: But Your Honor, they are challenging a parental notification policy saying that it's unlawful against the New Jersey Law Against Discrimination, when it does not require (indiscernible) notification and it treats all children equally across the board. It is facially a neutral policy and no child is singled out or picked on at all under the policy that is presently before Your Honor. Every kid is -- has -- will be subject to a teacher making the call if they believe the kid is being adversely impacted. If there

is no adverse impact, there is no notification and that discretion is solely with the teacher. Thank you.

THE COURT: Thank you, Mr. Giacobbe.

Any reply?

MR. MICHAEL: Just briefly. Just a couple of items. A lot of the discussion from the defendants here was framed in the context of a teacher. I just want to be clear that that's not what the policy applies to. It is not a policy that applies to -- it clearly and explicitly applies to both certificated and non-certificated staff. It's basically anybody who works in the school.

And just to follow-up, it is correct that what the policy does here is create this sort of an amorphous concept of, as Your Honor was touching on, of adverse impact. And it does sort of basically deputize anybody who works in the school to make their own assessment of what is an adverse impact. And it can't be lost that that has to be viewed and the concern here is heightened, based on how the district has defined adverse impact over the last couple of weeks and months, when they have explicitly include, or expressly included, sexual orientation and gender identity as items within a list of concerning and troubling behaviors.

Just one point I would make about the transgender policy, particularly with respect to the status quo. And counsel is correct, the one thing the transgender policy does allow parental notification for health and safety concerns, but one, I think why that policy is important here in terms of considering the harm, because what the policy does is, it doesn't just identify sort of whether a parental notification can be made, but how that, if it's going to be made, how it should be made, which includes talking to the student first and trying to put supports together and allow the student to perhaps deal, address it with the family first before the school reports it.

Under the current policy here that is all superseded, so those sort of protections, to protect against the harm --

THE COURT: Mr. Michael, you are not debating that that particular policy was a voluntary policy anyway subject to repeal by the Board at any time, correct?

MR. MICHAEL: Correct. But what that policy does, and it follows the, you know, the State Department of Education guidance, it basically, you know, helps provide guidance for schools to basically navigate these various issues and sort of set out ways that they can be

--

THE COURT: True, but as I think you argued the first time, there are many districts around the State that don't have any policy whatsoever with regard to the issue to maybe the statewide guidance, but there is not necessarily specific policy on the issue; is that correct?

MR. MICHAEL: I am not sure about many. I know it is not necessarily a mandatory policy. It's mandatory guidance that the DOE was required to put -- the Legislature directed DOE to put out the guidance, and in this particular area, basically directed in large part what the guidance should say. So, it is sort of an insight into --

THE COURT: Guidance, yes, but --

MR. MICHAEL: -- how the Legislature views the issue.

THE COURT: Right, but guidance yes; policy, no.

MR. MICHAEL: Right. But it is correct that this is not a policy that every district is mandated to have.

THE COURT: Thank you.

MR. MICHAEL: But of course, the Law Against Discrimination absolutely applies to --

THE COURT: I understand.

MR. MICHAEL: -- every district.

And you are correct, and I just would want to add on one additional thing, the directive in this policy for teachers does require them to, but also could potentially subject them to liability under the Law Against Discrimination, too, to the extent the teacher themselves is singling out a student based on a protected characteristic and making and treating them differently by making these sorts of reports, they, the teachers themselves, could potentially be liable and that's one of the claims in the underlying complaint is that the district here is, you know, sort of coercing, inciting and compelling staff to violate the LAD.

THE COURT: I understand the argument.

MR. MICHAEL: I have nothing else, Your Honor.

THE COURT: Thank you, Mr. Michael.

All right, counsel, I will reserve on my decision. I hope to have a written opinion for you two to three weeks. I know time is of the essence, the school year is upon us, and I will try to get it out to you as quickly as possible, but I want to give it the thought it deserves, all right?

MR. MICHAEL: Your Honor, if I can --

THE COURT: Thank you very much.

MR. MICHAEL: -- make just one clarification? But in the meantime, I believe that the restraints are still in place?

THE COURT: The temporary restraints continue until a decision is made.

MR. MICHAEL: Thank you, Your Honor.

THE COURT: Thank you.

(Proceeding concluded.)

CERTIFICATION

I, Cindy Nagle, the assigned transcriber, do hereby certify the foregoing transcript of proceedings on CourtSmart, Index from 10:13:05 to 11:06:13 is prepared to the best of my ability and in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings as recorded.

/s/ Cindy Nagle — AD/T 606

Cindy Nagle — AOC Number

Accurate Transcriptions, LLC — 9/8/23

Agency — Date

PLAINTIFF'S EXHIBIT
C

**SCHOOL DISTRICT OF THE CHATHAMS** **FILE CODE: 5131.1**
**Chatham, New Jersey**

**Regulation**

---

HARASSMENT, INTIMIDATION AND BULLYING

The board prohibits acts of harassment, intimidation or bullying against any student. School responses to harassment, intimidation and bullying shall be aligned with the board approved code of student conduct which establishes standards, policies and procedures for positive student development and student behavioral expectations on school grounds, including on a school bus or at school sponsored functions.

The superintendent shall be responsible for ensuring the prompt investigation and response to all reports of harassment, intimidation and bullying committed on school grounds, at school activities and on school buses.

The superintendent has the right and authority to impose a consequence on a student for conduct away from school grounds that is consistent with the board's approved code of student conduct, pursuant to N.J.A.C. 6A:16-7.1 and N.J.A.C. 6A:16-7.5.

Definition

Bullying is unwanted, aggressive behavior that may involve a real or perceived power imbalance. "Harassment, intimidation or bullying" is defined as any gesture, any written, verbal or physical act, or any electronic communication, whether it be a single incident or a series of incidents, that is reasonably perceived as being motivated either by any actual or perceived characteristic, such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression, or a mental, physical or sensory disability, or by any other distinguishing characteristic, that takes place on school grounds**,** at any school-sponsored function or on a school bus, or off school grounds, in accordance with law, that substantially disrupts or interferes with the orderly operation of the school or the rights of other students, and that:

A. A reasonable person should know, under the circumstances, it will have the effect of physically or emotionally harming a student or damaging the student's property, or placing a student in reasonable fear of physical or emotional harm to his/her person or damage to his/her property; or

B. Has the effect of insulting or demeaning any student or group of students; or

C. Creates a hostile educational environment for the student by interfering with the student's education or by severely or pervasively causing physical or emotional harm to the student.

"Electronic communication" means a communication that is transmitted by means of an electronic device, including, but not limited to a telephone, cellular phone, computer, or pager.

Classified students are subject to the same disciplinary procedures as nondisabled students and may be disciplined in accordance with their IEP. However, before disciplining a classified student, it must be determined that:

A. The student's behavior is not primarily caused by his/her educational disability;

B. The program that is being provided meets the student's needs.

Reporting Harassment, Intimidation and Bullying Behavior

The superintendent, principal and/or their designee shall be responsible for receiving complaints alleging violations of this policy.

The board shall allow reports to be anonymous, but no formal disciplinary action shall be based solely on an anonymous report. Any school employee, board member, contracted service provider, student, visitor or volunteer who has witnessed, or has reliable information that a student has been subject to harassment, intimidation or bullying, must report the incident to the building principal or his/her designee.

The following procedures shall apply to the reporting of incidents of harassment, intimidation and bullying committed by an adult or youth against a student:

A. All acts of harassment, intimidation, or bullying shall be reported verbally to the school principal on the same day when the school employee or contracted service provider witnessed or received reliable information regarding any such incident;

B. The principal shall inform the parents or guardians of all students involved in the alleged incident, and may discuss, as appropriate, the availability of counseling and other intervention services; and

C. All acts of harassment, intimidation, or bullying shall be reported in writing to the school principal within two school days of when the school employee or contracted service provider witnessed or received reliable information that a student had been subject to harassment, intimidation, or bullying.

A board member, school employee, contracted service provider, student or volunteer who has witnessed, or has reliable information that a student has been subject to, harassment, intimidation or bullying shall report the incident to the building principal and any appropriate school official, or to any school administrator or safe schools resource officer, who shall immediately initiate the school district's procedures concerning school bullying.

A board member or a school employee who promptly reports an incident of harassment, intimidation or bullying, to the appropriate school official designated by the school district's policy, or to any school administrator or safe schools resource officer, and who makes this report in compliance with the procedures in this policy, shall be immune from a cause of action for damages arising from any failure to remedy the reported incident.

A school administrator who receives a report of harassment, intimidation, or bullying from a district employee, and fails to initiate or conduct an investigation, or who should have known of an incident of harassment, intimidation, or bullying and fails to take sufficient action to minimize or eliminate the harassment, intimidation, or bullying, may be subject to disciplinary action.

The school administrator shall take into account the circumstances of the incident when providing notification to parents and guardians of all students involved in the reported harassment, intimidation, or bullying incident. The circumstances of the incident shall be considered conveying the nature of the incident, including the actual or perceived protected category motivating the alleged offense.

District Anti-Bullying Coordinator

The district anti-bullying coordinator shall:

A. Be responsible for coordinating and strengthening the school district's policies to prevent, identify, and address harassment, intimidation, and bullying of students;

B. Collaborate with school anti-bullying specialists in the district, the board of education, and the superintendent to prevent, identify, and respond to harassment, intimidation, and bullying of students in the district;

C. Provide data, in collaboration with the superintendent, to the Department of Education regarding harassment, intimidation, and bullying of students; and

D. Execute such other duties related to school harassment, intimidation, and bullying as requested by the superintendent.

The district anti-bullying coordinator shall meet at least twice a school year with the school anti-bullying specialists in the district to discuss and strengthen procedures and policies to prevent, identify, and address harassment, intimidation, and bullying in the district.

School Anti-Bullying Specialist

The school anti-bullying specialist shall:

A. Chair the school safety/school climate team;

B. Lead the investigation of incidents of harassment, intimidation, and bullying in the school; and

C. Act as the primary school official responsible for preventing, identifying, and addressing incidents of harassment, intimidation, and bullying in the school.

School Safety/School Climate Team

The school safety/school climate team shall:

A. Receive any complaints of harassment, intimidation, or bullying of students that have been reported to the principal;

B. Receive copies of any report prepared after an investigation of an incident of harassment, intimidation, or bullying;

C. Identify and address patterns of harassment, intimidation, or bullying of students in the school;

D. Review and strengthen school climate and the policies of the school in order to prevent and address harassment, intimidation, or bullying of students;

E. Educate the community, including students, teachers, administrative staff, and parents, to prevent and address harassment, intimidation, or bullying of students;

F. Participate in the training required pursuant to the provisions of (N.J.S.A.18A:37-13 et seq.) and other training which the principal or the district anti-bullying coordinator may request;

G. Collaborate with the district anti-bullying coordinator in the collection of district-wide data and in the development of district policies to prevent and address harassment, intimidation, or bullying of students; and

H. Execute such other duties related to harassment, intimidation, and bullying as requested by the principal or district anti-bullying coordinator.

A parent shall be on the school safety/school climate team only in regard to general school climate issues and shall not participate in activities that may compromise a student's confidentiality. Other members of the school safety/school climate team who are not authorized to access student records (see board policy 5125 Student Records) shall be on the team only in regard to general school climate issues and shall not participate in activities that may compromise a student's confidentiality.

Investigating Reported Harassment, Intimidation and Bullying

To protect the victim, the superintendent shall take into account the circumstances of the incident when communicating with parents/guardians and when following the investigation procedures. The principal, or his or her designee, in consultation with the anti-bullying specialist, shall make a preliminary determination prior to initiating an investigation, as to whether a reported incident or complaint, assuming all facts presented are true, is a report that qualifies as harassment, intimidation and bullying according to the law (within the scope of N.J.S.A. 18A:37-14).

If the principal, or his or her designee, in consultation with the anti-bullying specialist, determines that the incident or complaint is a report outside the scope of the law (N.J.S.A. 18A:37-14) and does not qualify as harassment, intimidation and bullying, this determination may be appealed to the board of education according to the appeal process detailed below, The determination of the board may be appealed to the commissioner of education in accordance with law (N.J.A.C. 6A:3).

When the principal, or his or her designee, in consultation with the anti-bullying specialist, determines that the reported incident qualifies as harassment, intimidation and bullying, the report shall be investigated promptly and in accordance with law and the following procedures:

A. All investigations shall be thorough and complete, and documented in writing, and shall include, but not be limited to:

1. Taking of statements from victims, witnesses and accused;
2. Careful examination of the facts;
3. Support for the victim; and
4. Determination if alleged act constitutes a violation of this policy.

B. The investigation shall be initiated by the principal or the principal's designee within one school day of the report of the incident and shall be conducted by a school anti-bullying specialist. The principal may appoint additional personnel who are not school anti-bullying specialists to assist in the investigation.

C. The investigation shall be completed as soon as possible, but not later than 10 school days from the date of the written report of the incident of harassment, intimidation, or bullying. In the event that there is information relative to the investigation that is anticipated but not yet received by the end of the 10-day period, the school anti-bullying specialist may amend the original report of the results of the investigation to reflect the information.

D. The results of the investigation shall be reported to the superintendent within two school days of the completion of the investigation, and in accordance with law and board policy. The superintendent may initiate intervention services, establish training programs to reduce harassment, intimidation, or bullying and enhance school climate, impose discipline, order counseling as a result of the findings of the investigation, or take or recommend other appropriate action.

E. The results of each investigation shall be reported to the board of education no later than the date of the next board meeting following the completion of the investigation, and include:

   1. Any services provided;
   2. Training established;
   3. Discipline imposed; or
   4. Other action taken or recommended by the superintendent.

F. The superintendent or his or her designee shall ensure that parents or guardians of the students who are parties to the investigation shall receive information about the investigation. This information shall be provided in writing within 5 school days after the results of the investigation are reported to the board and include:

   1. The nature of the investigation;
   2. Whether the district found evidence of harassment, intimidation, or bullying; or
   3. Whether discipline was imposed or services provided to address the incident of harassment, intimidation, or bullying.

G. Investigations of complaints concerning adult conduct shall not be investigated by a member of the same bargaining unit as the individual who is the subject of the investigation.

Appeal Process

The parent or guardian may request a hearing before the board concerning the written information about a harassment, intimidation, or bullying investigation. The request for a board hearing shall be filed with the board secretary no later than 60 calendar days after the written information is received by the parents or guardians. The hearing shall be held within 10 days of the request. The board shall meet in executive session for the hearing to protect the confidentiality of the students. At the hearing the board may hear from the school anti-bullying specialist about the incident, recommendations for discipline or services, and any programs instituted to reduce such incidents.

At the next board of education meeting following its receipt of the report, the board shall issue a decision, in writing, to affirm, reject, or modify the superintendent's decision. The board's decision may be appealed to the Commissioner of Education, in accordance with law, no later than the 90 days after the issuance of the board's decision.

A parent, student, guardian, or organization may file a complaint with the Division on Civil Rights within 180 days of the occurrence of any incident of harassment, intimidation, or bullying based on membership in a protected group as enumerated in the "Law Against Discrimination."

Approved Private Schools For Students With Disabilities (PSSDs)

The board is committed to ensuring that all district students that require placement in approved private schools for students with disabilities (PSSD) have the safe and civil environment in their school placement necessary for students to learn and achieve high academic standards. All approved PSSDs receiving students with disabilities from this district shall be committed to treating their students with civility and respect, and shall refuse to tolerate harassment, intimidation or bullying.

When an approved PSSD receives a complaint or report of an act of harassment, intimidation, or bullying involving a district student placed in the approved PSSD that occurred on a district school bus, at a district school-sponsored function and off school grounds, the approved PSSD shall notify the anti-bulling

coordinator of the report or complaint.

The superintendent shall assign a school anti-bullying specialist to investigate a complaint or report of harassment, intimidation, or bullying, occurring on district school buses, at district school-sponsored functions, and off school grounds involving a student who attends an approved PSSD. The investigation conducted by the district anti-bullying specialist shall be in consultation with the approved PSSD.

The full-time non-teaching principal of the approved PSSD shall report to the anti-bullying coordinator and the child study team director, any complaint or report of an act of harassment, intimidation, or bullying involving a district student placed in the approved PSSD that occurred at the PSSD or an activity sponsored by the PSSD. The report shall include the names of the district students who are parties to the harassment, intimidation, or bullying investigation and the results of each investigation. The principal of the approved PSSD shall make this report to the district anti-bullying coordinator and to the student's parents/guardians no later than five school days following the investigation's completion. The report to the district shall include information on any service(s) provided, training established, and discipline imposed, or other action taken or recommended by the full-time non-teaching principal of the PSSD.

Once an incident of harassment, intimidation, or bullying is identified, the full-time non-teaching principal of the approved PSSD shall determine the appropriate response to address the individual circumstances in consultation and conjunction with appropriate district staff, as necessary. The approved PSSD shall not, pursuant to N.J.A.C. 6A:14-7.6(f), unilaterally implement disciplinary action involving removal to an interim alternative educational setting, suspension of more than 10 consecutive or cumulative school days in a school year or termination of placement. Disciplinary action involving suspension and expulsion from the approved PSSD shall be implemented in conjunction with the district and according to law (N.J.A.C. 6A:14-2.8) and board policies 5114 Suspension and Expulsion and 6171.4 Special Education.

Parents or guardians of students who are parties to a harassment, intimidation, or bullying investigation conducted by this district or an approved PSSD in which their child is placed may request a hearing before the board of education concerning the information received about an investigation. Any request for a hearing before the board of education shall be filed within 60 calendar days after the written information about the harassment, intimidation, or bullying investigation is received by the district and the parents or guardians. The hearing before the board shall be scheduled in collaboration with the approved PSSD and held by the board within 10 business days of the request. The approved PSSD and the board shall coordinate the policies and procedures for conducting such hearings.

Reporting to the Board

Two times each year between September 1 and January 1 and between January 1 and June 30, the school board shall hold a public hearing at which the superintendent will report to the board of education all acts of violence, vandalism, and harassment, intimidation, or bullying (HIB) which occurred during the previous reporting period. The report shall include the number of HIB reports in the schools, the status of all investigations, the nature of the HIB, and other data required by law.

A. The number of reports of harassment, intimidation, or bullying;

B. The status of all investigations;

C. The nature of the bullying based on one of the protected categories identified in N.J.S.A. 18A:37-14 such as race, color, religion, ancestry, national origin, gender, sexual orientation, gender identity and expression, or a mental, physical or sensory disability, or by any other distinguishing characteristic;

D. The names of the investigators;

E. The type and nature of any discipline imposed on any student engaged in harassment, intimidation, or bullying; and

F. Any other measures imposed, training conducted, or programs implemented, to reduce harassment, intimidation, or bullying.

Reporting to the Department of Education

The information, including but not limited to, oral reports, written reports or electronic reports shall also be reported once during each reporting period between September 1 and January 1 and between January 1 and June 30, to the Department of Education. The report shall include:

A. Data broken down by the enumerated categories including the protected categories as listed above and the type of harassment, intimidation and bullying (any gesture; any written, verbal or physical act; or any electronic communication, whether it be a single or series of incidents); and

B. Data broken down by each school in the district, in addition to district-wide data.

The report shall be used to grade each school for the purpose of assessing its effort to implement policies and programs consistent with law (N.J.S.A. 18A:37-13 et seq.). The district shall receive a grade determined by averaging the grades of all the schools in the district.

Each school shall post the grade received by the school and the overall district grade on the homepage of the school's website. The district shall post all the grades for each school of the district and the overall district grade on the homepage of the district's website. A link to the report shall be available on the district's website. The information shall be posted on the websites within 10 days of the receipt of a grade by the school and district.

It shall be a violation to improperly release any confidential information not authorized by federal or state law for public release.

The superintendent will annually submit the report to the Department of Education utilizing the Student Safety Data System (SSDS). The superintendent shall accurately report on each incident of violence, vandalism, alcohol and other drug abuse, and incident of harassment intimidation and bullying within the school district. Any allegations of falsification of data will be reviewed by the board of education using the requirements and procedures set forth in N.J.A.C. 6A:16-5.3(g).

The State Board of Education shall impose penalties on any school employee who knowingly falsifies the report. Therefore, the superintendent shall make a reasonable effort to verify reports of violence, vandalism, and harassment, intimidation, or bullying. The board shall provide ongoing staff training, in cooperation with the Department of Education, in fulfilling the reporting requirements. The majority representative of the school employees shall have access monthly to the number and disposition of all reported acts of school violence, vandalism, and harassment, intimidation, or bullying.

Program Assessment and Review

Each school and the school district shall annually establish, implement, document, and assess bullying prevention programs or approaches, and other initiatives involving school staff, students, administrators, volunteers, parents, law enforcement and community members. The programs or approaches shall be designed to create school-wide conditions to prevent and address harassment, intimidation, and bullying.

Policy Development and Review

The district harassment, intimidation and bullying policy shall be adopted through a process that includes representation of parents or guardians, school employees, volunteers, students, administrators, and community representatives.

The district shall annually conduct a re-evaluation, reassessment, and review of this policy, any report(s) and/or finding(s) of the school safety/school climate team(s). The board shall also make any necessary revisions and additions to this policy as required by law. The board shall include input from the school anti-bullying specialists in conducting its re-evaluation, reassessment, and review. The district shall transmit a copy of the revised policy to the appropriate executive county superintendent within 30 school days of the revision.

Publication, Dissemination and Implementation

In publicizing this policy, the community including students, staff, board members, contracted service providers, visitors and volunteers, shall be duly notified that the rules detailed within apply to any incident of harassment intimidation and bullying that takes place on school grounds**,** at any school-sponsored function or on a school bus, or off school grounds that substantially disrupts or interferes with the orderly operation of the school or the rights of other students in accordance with law.

The superintendent shall take the following steps to publicize this policy:

A. Provide a link to this policy on a prominent place on the district website;

B. Provide a link to this policy on a prominent place on each school's website;

C. Distribute this policy annually to all staff, students and parents/guardians; and

D. Print this policy in any district publication that sets forth the comprehensive rules, procedures and standards of student conduct and in student handbooks;

The district shall notify students and parents/guardians the policy is available on the district's website. The district shall publish the name, school phone number, school address and school email address of the district anti-bullying coordinator on the home page of the district website. Each school within the district shall publish the name, school phone number, school address and school email address of the district anti-bullying coordinator and their school anti-bullying specialist on the home page of the school's website. The information concerning the district anti-bullying coordinator and the school anti-bullying specialists shall also be maintained on the Department of Education's website.

Additionally, the district shall make available, in an easily accessible location of its website, the Department of Education's guidance document for the use by parent/guardians, students and district staff to assist in resolving complaints concerning student harassment, intimidation or bullying.

The superintendent shall ensure the rules for this policy are applied consistently with the district's code of student conduct (N.J.A.C. 6A:16-7) and all applicable laws and regulations. All disciplinary sanctions shall be carried out with necessary due process.

This and all related policies shall be reviewed on a regular basis.

Adopted: January 8, 2024

PLAINTIFF'S EXHIBIT D

# REGULATION



## R 5600 PUPIL DISCIPLINE/CODE OF CONDUCT (M)

A. Purpose

The purpose of these regulations is to achieve the following:

1. Foster the health, safety, social, and emotional well-being of pupils;

2. Support the establishment and maintenance of civil, safe, secure, supportive, and disciplined school environments conducive to learning;

3. Promote achievement of high academic standards;

4. Prevent the occurrence of problem behaviors;

5. Establish parameters for the intervention and remediation of pupil problem behaviors at all stages of identification;

6. Make students and parents aware of the circumstances in which the school district must address conduct away from school grounds; and

7. Establish parameters for school responses to violations of the pupil discipline/code of conduct that take into account, at a minimum, the severity of the offenses, the developmental ages of the pupil offenders, and pupils' histories of inappropriate behaviors.

B. Rules of Conduct

1. All pupils are bound by law, policies of the Board of Education, and the administrative regulations of this school district.

2. In addition, pupils shall not:

   a. Be insubordinate to teachers or other school staff members or disregard their instructions or demonstrate lack of respect for their authority;

   b. Create disorder or disruptions on school premises;

   c. Use, threaten, or incite the use of physical force against other pupils, staff members, or visitors to the school;

d. Steal, damage, or deface the property of other pupils, staff members, or the district;

e. Engage in the sexual and/or other harassment of pupils or staff members;

f. Violate codes of conduct adopted for organizations of pupils;

g. Possess or use weapons or any implement intended to harm others;

h. Use foul, abusive, derogatory, or demeaning language, including racial and ethnic remarks;

i. Convey information about other pupils or staff members known to be false;

j. Act so recklessly as to endanger the safety of others;

k. Procure the property of others by threat or intimidation;

l. Enter school premises or any specific portion of the premises without permission and without authority;

m. Vandalize school property, real or personal;

n. Create litter on school property;

o. Be truant from school or class;

p. Cheat or otherwise engage in academic dishonesty;

q. Engage in illegal gambling;

r. Smoke on school property;

s. Falsify an excuse or any school document;

t. Set fire to or cause a fire in any way on school premises;

u. Possess or explode a firecracker or other explosive device on school premises;

v. Sound or cause to be sounded a false alarm for fire, bomb, or other condition or circumstance hazardous to others;

w. Possess, use, or distribute a substance in violation of Policy No. 5530;

x. Commit an act of harassment, intimidation, or bullying; or

y. Engage in any other activity expressly prohibited by a school staff member in authority.

3. Pupils assigned to a school bus must obey all school rules, and

a. Show respect for the driver at all times;

b. Enter and leave the bus in an orderly manner;

c. Ride only the bus to which they have been assigned;

d. Be and remain seated while the bus is in motion;

e. Avoid reckless and boisterous activity at all times, including during waits at pickup points;

f. Talk in a reasonable tone of voice and avoid loud noises;

g. Extend no portion of the body or other object out a bus window;

h. Keep aisles clear at all times;

i. Refrain from bringing animals or bulky, unmanageable projects onto the school bus;

j. Refrain from smoking, eating, and drinking on the bus; and

k. Possess, use, or distribute no substance in violation of Policy No. 5530.

4. The Building Principal or designee has the right to impose a consequence on a pupil for conduct away from school grounds pursuant to N.J.A.C. 6A:16-7.6. This authority shall be exercised only when it is reasonably necessary for the pupil's physical or emotional safety, security, and well-being or for reasons relating to the safety, security, and well-being of other pupils, staff, or school

grounds, pursuant to N.J.S.A. 18A:25-2 and 18A:37-2 or when the conduct which is the subject of the proposed consequence materially and substantially interferes with the requirements of appropriate discipline in the operation of the school. Consequences shall be handled in accordance with Policy and Regulation 5600, pursuant to N.J.A.C. 6A:16-7.1, and as appropriate, in accordance with N.J.A.C. 6A:16-7-2, 6A:16-7.3, or 6A:16-7.5.

C. Disciplinary Measures

The following disciplinary measures may be applied as appropriate to the pupil's violation of school rules. The measures shall be graded in severity according to the developmental needs of students at each grade level.

1. Admonishment

A school staff member in authority may admonish the pupil for his/her unacceptable conduct and warn the pupil that additional misconduct may warrant a more severe penalty.

2. Temporary Removal from Classroom

a. The classroom teacher may direct the pupil to report to the office of the administrator in charge of pupil discipline.

b. The teacher will complete a form that indicates the pupil's name, homeroom, and the conduct that has caused the pupil's removal from the room.

c. The administrator in charge of discipline will interview the pupil and determine which, if any, additional disciplinary steps are indicated.

3. Deprivation of Privileges

The pupil may be deprived of the privilege of:

a. Moving freely about the school building,

b. Participation in co-curricular or inter/intrascholastic activities,

c. Attendance at a school-related social or sports activity,

d. Participation in a graduation ceremony, or

e. Transportation by school bus, or

f. Any other privilege the Building Principal or designee determines may be appropriate and consistent with Policy 5600 and N.J.A.C. 6A:16-7.1 et seq.

4. Detention

a. The pupil may be required to report before, after, or during the school day to detention for a period of supervised study. Effort will be made to schedule the detention during a time that is convenient for the pupil and her/his parent or legal guardian.

b. Transportation will be the responsibility of the pupil's parent or legal guardian

c. The pupil may be excused from detention only for an unavoidable commitment previously made; any such excused detention must be made up on another day.

5. Saturday Detention

a. The pupil may be required to report to school on a Saturday for a period of supervised study.

b. The pupil shall be responsible for bringing school work or reading material to the detention, and shall observe all school and classroom rules while in attendance.

6. Grading

A pupil who has cheated on a test or assignment, plagiarized material, falsified sources, refused to submit assignments, or otherwise indulged in academic dishonesty or negligence (paragraph B.2.p.) may suffer a reduced grade by virtue of the disqualified work. In no other instance may a pupil's grade be lowered as a direct penalty for misconduct.

7. In-school Suspension

a. The pupil may be removed from his/her regular classes and required to report to an in-school suspension program for supervised study.

b. In-school suspension is a deprivation of the pupil's right to a thorough and efficient education and will not be imposed without the due process set forth in Policy and Regulation 5610.

8. Suspension from School

a. The pupil may be denied the right to attend school for a period of time pursuant to N.J.S.A. 18A:37-2, N.J.A.C. 6A:16-7.2, and 6A:16-7.3, and Policy 5610.

b. Suspension from school is a deprivation of the pupil's right to a thorough and efficient education and will not be imposed without the due process set forth in Policy and Regulation 5610.

9. Expulsion

a. The Board may expel a general education pupil from school, pursuant to N.J.S.A. 18A:37-2, N.J.A.C. 6A:16-7.5, and Policy 5620.

b. Expulsion is an extremely serious disciplinary measure; it deprives the pupil of his/her right to a thorough and efficient education and will not be imposed without the due process set forth in Policies 5610 and 5620.

D. Remedial Measures

The following remedial measures may be taken to aid in correcting pupil conduct and to ensure that the pupil is properly placed in an appropriate educational environment and is not in need of special education and/or related services.

1. Restitution and Restoration

a. The pupil may be required to:

(1) Make restitution, in kind or cost or labor, for any loss he/she has caused; or

(2) Restore to its former condition, by his/her own labor, any property the pupil has damaged or defaced.

(3) Otherwise make good for a harm caused to the school or other pupil.

b. A pupil who refuses to make restitution or restoration as directed may be disciplined by one or more of the measures included in paragraph C.

2. Counseling

a. The pupil may be required to consult with school guidance counselors to determine the causes of his/her misconduct and to assess the need for a change in educational placement.

b. The counselor will explain:

(1) Why the pupil's conduct is unacceptable to the school and damaging to the pupil,

(2) What the consequences of continued misconduct are likely to be, and

(3) Appropriate alternate behaviors.

c. The counselor may refer the pupil, as appropriate, for additional counseling, evaluation, intervention, treatment, or therapy. Referrals may be made to:

(1) The Child Study Team,

(2) Intervention and Referral Team,

(3) A public or private social agency, or

(4) A legal agency.

3. Parent Conferences

The pupil may be required to attend a meeting with his/her parent(s) and appropriate staff members to discuss the causes of the pupil's behavior, possible remediation, potential disciplinary measures, and alternative conduct.

4. Alternate Educational Program

The pupil may be assigned to an alternate educational program as recommended by the pupil's guidance counselor, classroom teacher, Child Study Team, principal, and/or principal superintendent.

E. Consequences and Remedial Measures for Acts of Harassment, Intimidation, or Bullying

1. Consequences

Consequences for a pupil who commits an act of harassment, intimidation, or bullying shall be varied and graded according to the nature of the behavior, the developmental age of the pupil, and the pupil’s history of problem behaviors and performance.

a. The consequences may include, but are not limited to, the examples listed below:

(1) Admonishment;

(2) Temporary removal from the classroom;

(3) Deprivation of privileges;

(4) Classroom or administrative detention;

(5) Referral to disciplinarian;

(6) In-school suspension during the school week or the weekend;

(7) After-school programs;

(8) Out-of-school suspension (short-term or long-term);

(9) Reports to law enforcement or other legal action;

(10) Expulsion; and

(11) Participation in school district-sponsored programs.

2. Remedial Measures

Remedial measures shall be designed to correct the problem behavior; prevent another occurrence of the problem; protect and provide support for the victim of the act; and take corrective action for documented systemic problems related to harassment, intimidation, or bullying.

F. Disciplinary Procedures

1. The Pupil Discipline/Code of Conduct Policy and Regulation 5600 shall be disseminated annually to all school staff, pupils, and parent(s). Principals will distribute these documents to all pupils on the first day of each school year and to transferring pupils on the first day of their enrollment in this district.

2. Teachers and administrators in charge of pupil discipline shall make every effort to administer these rules consistently and fairly.

3. The staff member who disciplines a pupil for conduct shall, however minimal the offense or the discipline,

    a. Orally inform the pupil of the conduct for which he/she is being disciplined; and

    b. Offer the pupil an opportunity to deny the charge or to present extenuating circumstances.

4. Where the discipline is greater than an admonishment, the pupil's parent(s) or legal guardian(s) will be notified of the offense and of the discipline imposed and will be offered an opportunity to confer with the staff member administering the disciplinary action.

5. Where the offense is serious and the discipline greater than detention, every effort will be made to notify the parent(s) prior to the informal hearing conducted in accordance with paragraph F.3.

6. An in-school suspension, suspension from school, or expulsion will be conducted in strict accordance with law and Policies 5610 and 5620.

7. Violations of the rules regarding pupil conduct on school buses will be handled as follows.

a. The driver will report the offensive conduct to the Principal of the school in which the pupil is enrolled by submission of a completed written form that includes the name of the pupil, the school, and the specific offensive conduct.

b. The parent(s) or legal guardian(s) will be notified, by copy of the form, of the pupil's conduct.

c. The Principal or designee will determine the discipline to be administered, in accordance with the severity of the infraction. In general, when the offense is not severe:

(1) On the first notice of misconduct, the pupil will be counseled, the parent(s) or legal guardian(s) notified, and the pupil may be suspended from the bus for one or more school day(s);

(2) On the second notice of misconduct, the pupil and parent(s) or legal guardian(s) will attend a conference, and the pupil may be suspended from the bus for multiple school days; and

(3) On the third notice of misconduct, the Principal will confer with the parent(s) or legal guardian(s) and the pupil may be suspended from the bus for a period not less than 10 school days or more than one semester or the balance of the school year, whichever is less.

d. When the misconduct is severe, the pupil may be summarily suspended from the bus pending a conference with the parent(s) or legal guardian(s) and further disciplinary action.

G. Pupils with Disabilities

For pupils with disabilities, subject to Individualized Education Programs in accordance with 20 U.S.C. §1400 et seq., the Individuals with Disabilities Educational Improvement Act, and accommodation plans under 29 U.S.C. §§ 794 and 705(20), pupil discipline and the code of conduct shall be implemented in accordance with the components of the applicable plans.

H. Pupil Rights

Pupils subject to the consequences of the Pupil Discipline/Code of Conduct Policy and Regulation shall be informed of their rights, pursuant to N.J.A.C. 6A:16-7.1(c)3.i. through vii., that include:

1. Advance notice of behaviors that will result in suspensions and expulsions that have been identified under authority of N.J.S.A. 18A:37-2;

2. Education that supports pupils' development into productive citizens;

3. Attendance in safe and secure school environments;

4. Attendance at school irrespective of pupils' marriage, pregnancy, or parenthood;

5. Due process and appeal procedures, pursuant to N.J.A.C. 6A:3-1.3 through 1.17, N.J.A.C. 6A:4 and, where applicable, N.J.A.C. 6A:14-2.7 and 2.8;

6. Parent notification consistent with the policies and procedures established pursuant to N.J.A.C. 6A:16-6.2(b)3; and

7. Protections pursuant to 20 U.S.C. §1232g and 34 CFR Part 99, Family Educational Rights and Privacy Act; 20 U.S.C. § 1232h and 34 CFR Part 98, Protection of Pupil Rights Amendment; N.J.A.C. 6:3-6, Pupil Records; 45 CFR §160, Health Insurance Portability and Accountability Act; 20 U.S.C. §6301, Title IV(A)IV §4155 of the Elementary and Secondary Education Act as reauthorized under the No Child Left Behind Act; 42 CFR Part 2, Confidentiality of Alcohol and Drug Abuse Patient Records; N.J.S.A. 18A:40A-7.1, School-based drug and alcohol abuse counseling; information from participants; disclosure; N.J.A.C. 6A:16-3.2, Confidentiality of pupil alcohol and other drug information; N.J.S.A. 18A:36-19, Creation; Pupil Records: Maintenance and Retention, Security and Access; Regulations; Non-Liability; N.J.A.C. 6A:14-2.9, Student Records; as well as other existing Federal and State laws pertaining to pupil protections.

I. Records

1. Instances of pupil discipline will be recorded in the pupil's file in strict compliance with N.J.A.C. 6A:32-7.1 et seq. and Policy No. 8330.

2. When a pupil transfers to a public school district from another public school district, all information in the pupil’s record related to disciplinary actions taken against the pupil by the school district and any information the school district has obtained pursuant to N.J.S.A. 2A:4A-60, disclosure of juvenile information;

penalties for disclosure, shall be provided to the receiving public school district, in accordance with the provisions of N.J.S.A. 18A:36-19(a), N.J.A.C. 6A:32-7.5(e)10.iv., and N.J.A.C. 6A:16-7.10.

a. The record shall be provided within two weeks of the date that the pupil enrolls in the receiving district.

b. Written consent of the parent or adult pupil shall not be required as a condition of the transfer of this information, however, written notice of the transfer shall be provided to the parent or the adult pupil.

c. When a pupil transfers to a private school, which includes all sectarian or nonsectarian nonprofit institutional day or residential schools that provide education for pupils placed by their parents and that are controlled by other than public authority, all pupil disciplinary records, with respect to suspensions or expulsions, shall be provided by the public school district of residence to the private school upon written request from the private school, in the same manner as such records would be provided by a public school district of residence to another public school district, pursuant to N.J.A.C. 6A:16-7.10(b).

d. The Board shall not use a pupil's past offenses on record to discriminate against that pupil.

e. All pupil disciplinary records maintained in the district shall conform with the requirements set forth in N.J.A.C. 6A:16-7.10(d).

J. Annual Report

The Superintendent of Schools shall report annually on the implementation of the Pupil Discipline/Code of Conduct Policy to the Board at a public meeting. The annual summary shall contain, at a minimum:

1. A numerical inventory of all violations of the pupil behavioral expectations in the Pupil Discipline/Code of Conduct Policy and Regulation;

2. Associated school responses to the violations of the pupil behavioral expectations;

3. An explanation and evidence of the effectiveness of the Pupil Discipline/Code of Conduct Policy and Regulation. The explanation and evidence, at a minimum, shall address:

a. The degree of effectiveness of the school district's activities in achieving the purposes of the Pupil Discipline/Code of Conduct Policy and Regulation, pursuant to the purposes as outlined in A. above; and

b. The degree and effectiveness of the implementation of the contents of the Pupil Discipline/Code of Conduct Policy and Regulation.

4. Any proposed changes to the school district's current policies, procedures, programs or initiatives, based on the annual report.

Issued: August 22, 2011